IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| INFOTEK CORPORATION, | |
| v. | Civil Action No. CCB-18-1386 |
| DWAYNE PRESTON | |

## MEMORANDUM

Now pending is a motion for partial summary judgment filed by InfoTek Corporation seeking to establish the liability of its former employee, Dwight Preston, for violating the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count I), trespassing upon InfoTek's chattels (Count IV), tortiously interfering with InfoTek's business relations (Count VI), and tortiously interfering with InfoTek's economic relations (Count VII). InfoTek's motion has been fully briefed (ECF 80, Pl. Mot. Partial Summ. J.; ECF 84, Def. Opp'n; ECF 85, Pl. Reply), and the court heard oral argument on August 3, 2022. After oral argument, Mr. Preston moved to reopen discovery (ECF 93, Def. Mot. to Reopen Disc.), which InfoTek opposed (ECF 94, InfoTek Opp'n to Def. Mot. to Reopen Disc.) For the following reasons, InfoTek's motion for partial summary judgment will be denied, and Mr. Preston's motion to reopen discovery will be granted.

## BACKGROUND

For nearly a decade, Dwayne Preston served as the Chief Financial Officer of InfoTek, a Maryland-based information technology company. (ECF 80-4, Non-Prosecution Agreement Statement of Facts, at ¶ 1.) Mr. Preston joined InfoTek in 2008 after being recruited by InfoTek's

1

founders, Jacky McComber and her then-husband Robert Kimmel.[1] (ECF 85-2, Preston Dep. 31:20–32:21.) Mr. Preston was no stranger to Ms. McComber or Mr. Kimmel when he was offered the CFO position. Mr. Preston went to high school with Mr. Kimmel, and the two became close friends. (*Id.* at 19:3–20:21.) The list of personal relationships in the company grew even longer when Mr. Preston's wife, Jamie Preston, began working at InfoTek in May 2015. (*Id.* at 56:11–57:3; ECF 80-4, Non-Prosecution Agreement Statement of Facts, at ¶ 4.)

Mr. Preston's duties as CFO included managing InfoTek's accounting department and maintaining the company's books, records, and payroll. InfoTek, like most companies, had a suite of network-based programs and applications to assist with these processes. A system called Unanet, for example, tracked the hours of InfoTek's employees and their accrued paid time off.

As CFO, Mr. Preston had administrative privileges granting him broad access to the Unanet system. An employee with a standard Unanet account could access only their *own* time entries, while an administrative account could view and edit the timesheets of *every* employee. (ECF 85-2, Preston Dep. 105:17–106:9.) Mr. Preston was not the only InfoTek executive with administrative access to Unanet; Ms. McComber, who became InfoTek's sole owner[2] after her and Mr. Kimmel's divorce, had an account with identical Unanet privileges. (*Id.* at 106:10-20.) During Mr. Preston's tenure as CFO, Ms. McComber gave Mr. Preston her password so he could help set up Unanet reports tailored to her account. (*Id.* at 102:2-15; *see also* ECF 80-4, Non-Prosecution Agreement Statement of Facts, at ¶ 2.) Ms. McComber's Unanet password was saved on Mr. Preston's cell phone as a result. (ECF 85-2, Preston Dep. 102:13-18, 107:7-16.)

---

[1] Jacky McComber was previously known as Jacky Kimmel.

[2] Ms. McComber, as the sole shareholder of the company, made her and InfoTek essentially "one in the same." (*See* ECF 84-2, InfoTek Corporate Designee Dep. 135:14-20.)

2

In March 2017, Mr. Preston resigned as CFO. (ECF 85-2, Preston Dep. 76:14-15.) On Mr. Preston's last day, March 31, 2017, InfoTek revoked his Unanet account. (*Id.* at 78:3-6.) Mr. Preston, however, continued to access InfoTek's Unanet system from Ms. McComber's account without permission. (*Id.* at 82:4-17, 159:7–160:3.) The first time Mr. Preston logged into the system was, according to him, entirely incidental; he allegedly did not realize his phone had saved Ms. McComber's password. (*Id.* at 159:1-6.) But Mr. Preston's curiosity soon got the best of him.

In April or May 2017, Mr. Preston began snooping into Ms. McComber's time entries and invoices on Unanet to see if she was billing her time on days she was not working. (*Id.* at 159:15–160:3, 109:18–110:3.) Because of his illicit sleuthing, Mr. Preston allegedly discovered Ms. McComber was billing to a government contract on days she was participating in activities unrelated to work, such as golfing. (*Id.* at 109:18–110:3.) This revelation was not entirely shocking to Mr. Preston, who had allegedly questioned Ms. McComber's billing practices while he was working at InfoTek. (*Id.* 108:16–109:17.) Ms. McComber had served as the project manager on the contract at issue, known as the IRONBRIDGE contract. (ECF 80-4, Non-Prosecution Agreement Statement of Facts, at ¶¶ 8, 11.) Mr. Preston allegedly made no changes to Ms. McComber's recorded hours, which were used to generate invoices sent to, and paid by, the National Security Agency. (*Id.*)

Until then, Mr. Preston had simply viewed information on InfoTek's network. But his look-not-touch approach ended after InfoTek fired his wife, Jamie Preston, in June 2017. (ECF 85-2, Preston Dep. 163:19–164:3.) Upset with his wife's termination, Mr. Preston accessed and altered data stored on InfoTek's Unanet system on July 19, 2017. (*Id.*) Using Ms. McComber's credentials, Mr. Preston gave several InfoTek employees extra paid time off ("PTO"), and edited InfoTek's billing rates on several contracts. (*Id.* at 101:9–102:1, 163:19–164:2.) During this

intrusion, which lasted around 42 minutes, Mr. Preston also viewed Ms. McComber's time records, but made no changes to any of her information or invoices. (ECF 80-4, Non-Prosecution Agreement Statement of Facts, at ¶ 11.) Mr. Preston's intrusion on July 19, 2017, was the final time Mr. Preston accessed InfoTek's Unanet system without authorization. (ECF 85-2, Preston Dep. 156:8-13.)

By late July 2017, InfoTek knew something was amiss when two employees reported their PTO information in Unanet had been changed. (ECF 84-2, InfoTek Corporate Designee Dep. 50:4-7.) With this notice, the company fixed the altered data (*id.* at 53:13-19), and a human resources representative for InfoTek[3] set out to determine how the PTO numbers were changed (*id.* at 51:13-15). Although InfoTek knew someone must have inappropriately accessed the system, the culprit's identity was still a mystery at that time. (*Id.* at 50:7-10.)

But InfoTek soon had a much bigger problem than the unidentified Unanet intrusion. In late August 2017, the NSA received an anonymous whistleblower letter alleging Ms. McComber had fraudulently billed the NSA under the IRONBRIDGE contract. (ECF 85-2, Preston Dep. 188:6-19.)[4] The NSA Inspector General began investigating the issue, and interviewed Ms. McComber on October 3, 2017.

Faced with these two concerns—the Unanet intrusion and the NSA's investigation— InfoTek hired a team of digital forensic agencies and other private entities to assist the company. (*See* ECF 84-2, InfoTek Corporate Designee Dep. 50:15–51:18.) The team included

---

[3] InfoTek's 30(b)(6) deponent described this HR representative as the "Director of Human Capital." It appears this person was part of Ashton Group Services (ECF 84-2, InfoTek Corporate Designee Dep. 161:5-15), which is a company that provided personnel services for InfoTek. (*Id.* at 169:4-10.)

[4] Mr. Preston denies sending this letter. (ECF 85-2, Preston Dep. 188:12-13.) Sometime between July and September 2017, however, Mr. Preston submitted an online whistleblower tip to the federal government describing Ms. McComber's alleged misconduct related to billing and recordkeeping. (*Id.* at 155:19–156:19, 157:4–158:1.) The anonymous letter sent to the NSA, according to Mr. Preston, contained more detail than the online tip he submitted. (*Id.* at 189:9-18.)

companies such as Ashton Group Services ("AGS"), Atlantic Data Forensics ("ADF"), Ring0 Technologies, and the law firm Offit Kurman. The parties dispute whether these companies were hired mainly to investigate the Unanet intrusion or to construct a defense against the NSA's probe.

In any event, InfoTek eventually learned Mr. Preston was the perpetrator of the Unanet intrusion and filed this suit on May 14, 2018 (ECF 1), alleging seven causes of action: violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count I); violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 (Count II); unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); trespass to chattels (Count IV); misappropriation of trade secrets in violation of Maryland's Uniform Trade Secrets Act, Md. Code Ann., Com. Law § 11-1201 (Count V); tortious interference with business relations (Count VI); and tortious interference with economic relations (Count VII).

A new component to this case emerged during discovery. On February 25, 2021, a federal grand jury indicted Ms. McComber on charges of submitting false claims and making false statements about the hours she claimed to have worked on the IRONBRIDGE contract. *See United States v. McComber*, Crim. No. ELH-21-0036 (D. Md. Feb. 25, 2021). Ms. McComber has pled not guilty, and her criminal trial is set for October 24, 2022.

This civil case has become somewhat ensnared by Ms. McComber's criminal case. To start, Mr. Preston has been unable to take a substantive deposition of Ms. McComber due to a combination of scheduling conflicts[5] and Ms. McComber's reliance on the Fifth Amendment's protection against self-incrimination. After three years of avoiding Mr. Preston's deposition

---

[5] "Scheduling conflicts" could also be described as "dilatory tactics," according to Chief Magistrate Judge Gesner's decision denying InfoTek's attempt to stay this case pending the resolution of Ms. McComber's criminal trial. (ECF 70, October 4, 2021 Mem. Denying Mot. to Stay.)

5

requests, Ms. McComber appeared for a deposition on November 29, 2021, only to invoke the Fifth Amendment in response to essentially every question. (ECF 93-7, McComber Dep.)

Ms. McComber's criminal case became even more relevant to this proceeding when Mr. Preston signed a non-prosecution agreement with the Department of Justice. On July 5, 2021, federal prosecutors agreed not to prosecute Mr. Preston in exchange for his potential cooperation in Ms. McComber's criminal case. (ECF 80-3, Non-Prosecution Agreement.) Under the agreement, Mr. Preston admitted to accessing InfoTek's Unanet network without authorization; he also confessed to committing perjury during his initial deposition in this case, where he denied having impermissibly accessed InfoTek's Unanet system. (ECF 80-4, Non-Prosecution Agreement Statement of Facts, at ¶ 16.)[6]

InfoTek sought to capitalize on Mr. Preston's admissions. To that end, InfoTek moved for partial summary judgment to establish Mr. Preston's liability as to several of InfoTek's claims. During the hearing on InfoTek's motion, Mr. Preston argued that the court should not grant InfoTek's motion on such a limited record and pointed to Ms. McComber's lack of substantive participation in a deposition. Mr. Preston also argued that InfoTek's Rule 30(b)(6) deponent was neither formally affiliated with InfoTek nor prepared to fully answer questions on InfoTek's behalf. After oral argument, Mr. Preston moved to reopen discovery. (ECF 93, Pl. Mot. to Reopen Disc.)

**LEGAL STANDARD**

---

[6] Mr. Preston made other false statements during his initial deposition in this case. He also made false statements in an interview with government representatives on March 16, 2018. (ECF 80-4, Non-Prosecution Agreement Statement of Facts, at ¶¶ 16–17.) Mr. Preston has, based on his best recollection, corrected the false statements made in the deposition via errata provided to InfoTek's counsel. (*Id.* at ¶ 18.) Mr. Preston participated in another deposition in this case on December 17, 2021. (ECF 85-2, Preston Dep.)

Under Federal Rule of Civil Procedure 56(a), summary judgment should be granted if the movant shows "there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## DISCUSSION

### I. InfoTek's Motion for Partial Summary Judgment

#### a. Computer Fraud and Abuse Act

A person violates the CFAA by "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer," 18 U.S.C. § 1030(a)(2)(C), or "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage and loss."

7

18 U.S.C. § 1030(a)(5)(C). To prevail on a civil CFAA claim, a plaintiff must establish the violation caused "loss to 1 or more persons during any 1–year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I).[7] Mr. Preston concedes he intentionally accessed InfoTek's Unanet system[8] without authorization, so the only question remaining is whether Mr. Preston's intrusion caused at least $5,000 in damage or loss.[9]

The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Costs incurred in investigating an offense also qualify as losses. *See A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009); *see also GSP Fin. Servs., LLC v. Harrison*, Civil No. GJH-18-2307, 2021 WL 288172, at *5 (D. Md. Jan. 28, 2021) (noting "the value of many hours of valuable time away from day-to-day responsibilities" may be included as part of the "loss" calculation).[10] Once a qualifying CFAA loss is shown, the plaintiff must also prove that the costs were reasonably necessary and causally related to the CFAA violations. *See Glob. Pol'y Partners, LLC v. Yessin*, 686 F. Supp. 2d 642, 647–48 (E.D. Va. 2010).

---

[7] The statute exempts certain claims from the $5,000 requirement, but none of those exemptions apply here. *See* 18 U.S.C. § 1030(c)(4)(A)(i) (exempting from the jurisdictional loss requirement claims alleging impairment of a medical diagnosis, physical injury to a person, a threat to public health or safety, or damage affecting a computer used by the United States Government in furtherance of the administration of justice, national defense, or national security).

[8] The parties do not dispute that InfoTek's Unanet system constitutes a "protected computer." Under the CFAA, "computer" means a "high-speed processing device . . . and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." 18 U.S.C. §1030(e)(1). InfoTek's Unanet system qualifies as a "*protected* computer" because the system "is used in or affecting interstate or foreign commerce or communication." *See* 18 U.S.C. §1030(e)(2)(B) (emphasis added).

[9] InfoTek attempts to demonstrate the monetary threshold amount under a "loss" theory, rather than a "damage" theory, likely because InfoTek was able to undo Mr. Preston's alterations in Unanet before the company paid out extra PTO. (*See* ECF 84-2, InfoTek Corporate Designee Dep. 53:13-19.)

[10] Unreported cases are cited for the soundness of their reasoning, not for any precedential value.

InfoTek claims its investigation into the Unanet intrusion cost the company tens of thousands of dollars. Yet a genuine dispute remains as to whether these costs were reasonably necessary to restore or resecure the Unanet system after Mr. Preston's intrusion. *See id.* (citing *United States v. Middleton*, 231 F.3d 1207, 1213 (9th Cir. 2000)). InfoTek hired four companies in the relevant period: Ashton Group Services ("AGS"), Atlantic Data Forensics ("ADF"), Ring0 Technologies, and Offit Kurman. A reasonable jury could conclude InfoTek assembled these impressive (and costly) companies not to restore or resecure the Unanet system, but to develop a defense for Ms. McComber against criminal charges.

InfoTek requested Ashton Group Services to evaluate the PTO accruals of InfoTek employees on July 24, 2017, just five days after Mr. Preston's final intrusion. Even assuming InfoTek mentioned AGS's expenses in its initial motion,[11] InfoTek's support rests on a *single* email from an AGS employee estimating that AGS's costs related to the breach would be between $10,000 to $15,000 dollars. (ECF 85-5, AGS Cost Estimate Email.)

AGS's cost estimates are so vague that a reasonable jury could conclude its expenses were not reasonably necessary to restore or resecure the Unanet system. *See Yessin*, 686 F. Supp. 2d at 652. The email, drafted on a "quick turnaround" and sent to Ms. McComber "for settlement" purposes, contains no indication that InfoTek paid the estimated amount. (*See* ECF 85-5, AGS Cost Estimate Email.) No evidence explains how exactly AGS "investigated" the breach, or how AGS calculated its estimated costs. The email does not even estimate how many hours AGS spent investigating the breach. And Mr. Crews admitted AGS provided other services for InfoTek at that time (*see* ECF 84-2, InfoTek Corporate Designee Dep. 169:7-8), which makes the amount

---

[11] The first mention of services provided by AGS, Ring0 Technologies, or Offit Kurman is in InfoTek's reply. Arguably, "[b]y failing to raise and argue this point in [its] initial Motion, [InfoTek] waived it." *See Rose v. Harloe Mgmt. Corp.*, Civil No. GLR-16-761, 2017 WL 193295, at *6 n.3 (D. Md. Jan. 17, 2017) (citing *Sher v. Luxury Mortg. Corp.*, Civil No. ELH-11-3656, 2012 WL 5869303, at *9 n.11 (D. Md. Nov. 19, 2012)).

attributable to the intrusion impossible to analyze on this record. *See B.U.S.A. Corp. v. Ecogloves, Inc.*, Civil No. JSR-05-9988, 2009 WL 3076042, at *8 (S.D.N.Y. Sept. 28, 2009) ("There is no evidence in the record that allows this calculation to be done with any confidence.").

In August 2017, InfoTek evidently worked with Ring0 Technologies, which analyzed Unanet login reports to help identify the telephone provider of the then-unknown intruder. But InfoTek cannot claim Ring0's services as losses given the lack of any documentation of the *cost* of Ring0's services. *See Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 694 (D. Md. 2011) (granting summary judgment for defendant when the plaintiff submitted "no additional proof of [their] payment, no itemization of the costs, nor any other facts from which one could determine that these were 'reasonable costs' as required under the CFAA").

InfoTek next hired Offit Kurman and Atlantic Data Forensics, but neither of those companies' invoices help InfoTek establish the jurisdictional loss requirement. (ECF 85-7, Offit Kurman Invoices; ECF 80-5, ADF Invoices.) Offit Kurman's invoices contain only three billing entries—totaling a few hundred dollars—prior to Ms. McComber's interview with the NSA Inspector General on October 3, 2017. And ADF did not start billing InfoTek until November 13, 2017, several weeks after Ms. McComber's interview. InfoTek contends its rapid cost hike simply coincided with the company learning of the NSA's investigation of Ms. McComber. But InfoTek's 30(b)(6) deponent told a different story. It was not until *after* the NSA received a whistleblower complaint that InfoTek "began to look *very heavily* into not only the security audit logs of Unanet, but also hired outside digital forensics agencies such as the Atlantic, among others, to review and

[find] out how all of this information had been changed[.]" (ECF 84-2, InfoTek Corporate Designee Dep. 50:15–51:3, emphasis added).[12]

Victims of CFAA violations may neither make a mountain out of a molehill when investigating intrusions, nor use summary judgment to rubberstamp expenses toward the jurisdictional loss threshold. There remains a genuine dispute about whether InfoTek's costs were "reasonably necessary" under the circumstances. *See Yessin*, 686 F. Supp. at 647.[13] After all, Mr. Preston's alterations to Unanet were reversed before InfoTek paid out *any* extra PTO. (ECF 84-2, InfoTek Corporate Designee Dep. 53:13-19.) Perhaps this explains why InfoTek was merely "looking into" the breach before rapidly expanding its forensic investigation upon notice of the whistleblower complaint. (*Id.* at 51:13-14, 75:10-13.)[14] Whether the looming specter of an NSA probe pushed InfoTek to increase its expenses beyond what was reasonably necessary is a factual question best suited for a jury, not summary judgment.[15]

### b. Trespass to Chattels

---

[12] After a break in his deposition, Mr. Crews clarified that InfoTek hired Offit Kurman before it learned of the whistleblower complaint. (ECF 84-2, InfoTek Corporate Designee Dep. 98:3–99:9.)

[13] The presence of litigation-adjacent services makes this dispute particularly fact-intensive. Fees paid for *investigating* an intrusion are CFAA-qualifying losses under the CFAA, but fees paid to assist in *litigation* do not count toward the $5,000 threshold. *See Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) (collecting cases); *cf. ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 268 (N.D. Ill. 2020) ("The purported loss must have a reasonable causal connection to the CFAA violation, instead of costs associated with the loss of confidential information or *preparation for litigation*[.]") (emphasis added).

[14] There is a dispute about whether Ms. McComber fabricated a document in her criminal case. (*See* ECF 89-1, Def. Mem. Supp. Mot. to Postpone Hearing). Mr. Preston argues he now has "reason to believe that any third-party invoices submitted in this matter should be further analyzed as to their authenticity." (*Id.* at ¶ 8.) The court need not reach this issue because InfoTek's motion will be denied on other grounds.

[15] Counsel for InfoTek agreed during oral argument that a jury trial would be necessary on the issue of damages *even if* the court were to grant InfoTek's motion for summary judgment. Accordingly, the court's denial of summary judgment will have little impact, practically speaking, on the parties' preparation for trial.

Under Maryland law,[16] trespass to chattels occurs when a person intentionally uses or intermeddles with a chattel in possession of another resulting in the chattel being "impaired as to its condition, quality, or value." *See Wilson*, 813 F. Supp. 2d at 697) (citations omitted). A chattel owner "is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel." *Van Alstyne v. Elec. Scriptorium, Ltd.*, 560 F.3d 199, 208 (4th Cir. 2009) (quoting Restatement (Second) of Torts § 218 cmt. e).[17] Indeed, "nothing in the common law of trespass to chattel alters 'the traditional understanding that tort recovery requires not only wrongful act plus causation reaching to the plaintiff, but proof of some harm for which damages can reasonably be assessed.'" *Id.* (citing *Doe v. Chao*, 540 U.S. 614, 621 (2004)).

Mr. Preston admits to intentionally accessing InfoTek's Unanet system without authorization. But whether his intrusion impaired the "condition, quality, or value" of the Unanet system remains in dispute. Unlike the plaintiffs in *American Online, Inc. v. IMS*, 24 F. Supp. 2d 548, 550 (E.D. Va. 1998), InfoTek provides little evidence that Mr. Preston's intrusion damaged the company's "business goodwill." *See id.* at 550. And far from the alleged trespass in *Wilson*, 813 F. Supp. 2d at 697, where the defendant took down and prevented the plaintiffs from accessing their own website, Mr. Preston never deprived InfoTek from accessing Unanet or any other part of their network.

InfoTek's best argument may be that the intrusion "diminished the value of its possessory interest in its computer network." *See Am. Online, Inc.*, 24 F. Supp. 2d at 550. But InfoTek has not

---

[16] The parties, and the court, agree that Maryland law governs InfoTek's common law tort claims. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[17] Maryland law follows the same guidance from the Restatement (Second) of Torts. *See Staub v. Staub*, 376 A.2d 1129, 1132 (Md. 1977) ("The importance of the distinction between trespass to chattels and conversion . . . lies in the measure of damages. In trespass the plaintiff may recover for the diminished value of his chattel because of any damage to it, or for the damage to his interest in its possession or use.")

12

established what, if any, "value" was diminished due to Mr. Preston's intrusion. Mr. Preston's breach neither caused InfoTek's "machine[s] to malfunction," see *Microsoft Corp. v. John Does 1-8*, No. 1:14-CV-811, 2015 WL 4937441, at *12 (E.D. Va. Aug. 17, 2015), nor "degraded [Unanet's] performance," nor resulted in the "theft of money." *See id.* Accordingly, the court will deny InfoTek's motion for partial summary judgment as to its claim for trespass to chattels.

### c. Tortious Interference with Business Relations and Economic Relations

To prevail on a claim for tortious interference with business relations under Maryland law, a plaintiff must establish: "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *See Wilson*, 813 F. Supp. 2d at 703 (quoting *Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 53 (Md. 2003)).[18] A claim for wrongful interference will fail, however, if "the defendant is a party to the economic relationship with which the defendant has allegedly interfered." *Kaser*, 831 A.2d at 54. In other words, liability arises only if there are three parties involved: "the parties to a contract or other economic relationship (P and T) and the interferer (D)." *See K & K Mgmt., Inc. v. Lee*, 557 A.2d 965, 973 (Md. 1989).

Here, no evidence suggests Mr. Preston's actions interfered with any party other than InfoTek. InfoTek's vague suggestion that the intrusion hurt the company's "good will and reputation" (ECF 85, Pl. Reply, at 10) is not sufficient. *See Baron Fin. Corp. v. Natanzon*, 471 F.

---

[18] In its complaint, InfoTek brought two separate claims for interference: tortious interference with business relations (Count VI) and tortious interference with economic relations (Count VII). "Tortious interference with business relations" appears to be synonymous with "tortious interference with economic relations." Neither party distinguished between Count VI and Count VII, so the court will address these counts simultaneously. There is, however, a distinction between tortious interference with *contract*, and tortious interference with economic relations. *See Nat. Design, Inc. v. Rouse Co.*, 485 A.2d 663, 674 (Md. 1984). But that distinction is not at issue here because InfoTek has failed to allege the existence of a specific contract damaged by Mr. Preston's interference.

Supp. 2d 535, 542 (D. Md. 2006) (noting a tortious interference claim requires "more than a disruption of a future relationship to a yet to be determined party"). InfoTek tries to revive its claim by arguing Mr. Preston sought to "target" InfoTek's employees with his intrusion. (ECF 85, Pl. Reply, at 10). But InfoTek's own employees do not constitute a third-party. And Mr. Preston *gave* InfoTek's employees *more* PTO (ECF 85-2, Preston Dep. 163:21), which does not reflect an intent "to foment discord and ill-will" among employees. (ECF 85, Pl. Reply, at 10).[19]

Further, InfoTek has not established that Mr. Preston's "specific purpose was to interfere with [InfoTek's] prospective business relationships." *Nordstrom, Inc. v. Schwartz*, Civil No. GJH-18-3080, 2019 WL 4221475, at *2–3 (D. Md. Sept. 5, 2019) (citing *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 270 (Md. 1994)). Instead, Mr. Preston's intrusion was motivated by a general desire "to be a nuisance." (ECF 85-2, Preston Dep. 164:1-2.) Mr. Preston's revenge-driven mission to pester InfoTek for firing his wife is not enough to establish the requisite level of intent. And even if InfoTek were to connect Mr. Preston's actions with some adverse consequences, summary judgment would still be inappropriate because indirect impacts to business relationships cannot establish liability. *See Alexander*, 650 A.2d at 270 ("[A]cts which [only] *incidentally* affect another's business relationships are not a sufficient basis for the tort.") (emphasis added).

Accordingly, InfoTek's motion for summary judgment as to Mr. Preston's liability for tortious interference with business and economic relations (Counts VI and VII) will be denied.

**II.    Mr. Preston's Motion to Reopen Discovery**

---

[19] InfoTek's pivot to arguing Mr. Preston interfered with InfoTek's contractual relationship with its at-will employees is unpersuasive because "[a] broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved." *See Rouse Co.*, 485 A.2d at 674.

14

The court has discretion in deciding whether to reopen discovery upon the request and a showing of good cause by a party. *See* Fed. R. Civ. P. 16(b)(4). "The primary consideration of the court in addressing whether 'good cause' has been shown under Rule 16(b) relates to the movant's diligence." *Edwards v. Edwards*, Civil No. DKC-12-3761, 2014 WL 1573504, at *3 (D. Md. Apr. 18, 2014) (citing *Montgomery v. Anne Arundel Cnty., Md.*, 182 F. App'x 156, 162 (4th Cir. 2006) (per curiam)).

Mr. Preston has shown good cause to reopen discovery. He has diligently attempted to take Ms. McComber's deposition, either in her individual capacity or as a corporate designee for InfoTek, for nearly three years. In the meantime, InfoTek sought to stay this civil proceeding pending the outcome of Ms. McComber's criminal trial. On October 4, 2021, however, Chief Magistrate Judge Gesner denied InfoTek's motion to stay. (ECF 70, October 4, 2021 Mem. Denying InfoTek's Mot. to Stay.) Judge Gesner wrote that the "time has long since passed for [Mr. Preston] to depose Ms. McComber so as to discover information regarding [InfoTek's] allegations against him." (*Id.* at 7.) Ms. McComber finally appeared for a deposition on November 29, 2021, and invoked the Fifth Amendment in response to nearly every question. (ECF 93-7, McComber Dep.)

To be clear, Ms. McComber was fully entitled to avail herself of her constitutional right against self-incrimination. But Ms. McComber's counsel evidently made a representation that "Mr. Preston is *entitled* to Ms. McComber (and InfoTek's) *substantive* deposition testimony prior to the civil trial." (ECF 93-5, Email Exchange Between Counsel, at 3, emphasis added.) That Mr.

15

Preston relied on this promise comes as no surprise.[20] Ms. McComber, as the CEO and sole owner of InfoTek, is involved directly in the central disputes here and may be the only person who can testify about certain material facts.

Mr. Preston's lack of access to meaningful discovery is also evident in InfoTek's designation and preparation of Mr. T.J. Crews under Rule 30(b)(6). Rule 30(b)(6) provides that persons designated to represent an organization "shall testify as to matters known or reasonably available to the organization." *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479, 487 (D. Md. 2005). "If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation." *Id.* (quoting *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996)). A corporate designee is required to "review all matters known or reasonably available to it in preparation for the Rule 30(b)(6) deposition. This interpretation is necessary in order to make the deposition a meaningful one and to prevent the 'sandbagging' of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial." *Id.* (quoting *Taylor*, 166 F.R.D. at 362).

---

[20] InfoTek offered Mr. Preston the choice of whether to depose Ms. McComber before or after her criminal trial. (*See* ECF 93-5, Email Exchange Between Counsel, at 3.) Because the timing of the deposition was up to Mr. Preston, InfoTek urges the court to hold Mr. Preston to his "imprudent" decision. (*See id.*) The court disagrees with InfoTek. Mr. Preston's "decision" about when to take Ms. McComber's deposition was nothing more than a "heads I win, tails you lose" situation curated by InfoTek. This conversation took place in the context of InfoTek's motion to stay the civil proceedings until Ms. McComber's criminal trial had concluded. An agreement to depose Ms. McComber *after* her criminal proceeding would have forced Mr. Preston into essentially consenting to the stay.

Based on the transcript of his deposition, Mr. Crews did not seem prepared to answer questions to the extent contemplated by Rule 30(b)(6).[21] Mr. Crews could not testify about the type of damages alleged by InfoTek (ECF 84-2, InfoTek Corporate Designee Dep. 78:2-6), whether InfoTek's own employees investigated the Unanet intrusion (*id.* at 80:5-15), whether InfoTek paid salaries to certain employees (*id.* 80:16-21), or whether InfoTek even paid certain invoices (*id.* at 116:7-20). None of this is to say InfoTek acted in bad-faith in underpreparing Mr. Crews. But the lack of substantive answers by *both* Mr. Crews and Ms. McComber show that discovery has not been a two-way street.

InfoTek argues Mr. Preston waived his right to request further discovery by submitting a joint status report noting, "[t]he parties have successfully completed the depositions of Plaintiff, Mrs. McComber, Defendant, Jamie Preston, and Robert Kimmel." (ECF 76, January 6, 2022, Joint Status Report.) That status report, however, was simply an administrative update advising the court that the depositions happened. Again, Ms. McComber was well-within her right to avoid self-incrimination by refusing to answer questions in her deposition. A motion to compel by Mr. Preston, at that time, would have been futile. Mr. Preston is entitled to a substantive deposition before trial, as promised by InfoTek's counsel. Accordingly, the court will grant Mr. Preston's

---

[21] Mr. Preston contends that Mr. Crews's association with InfoTek is dubious given that Mr. Crews has never worked for InfoTek. Indeed, Mr. Crews owns and operates a different company that provided InfoTek with technical services in exchange for office space. But Mr. Preston's contention is not relevant to Rule 30(b)(6), which permits an organization to designate former and even non-employees as deponents so long as that person is prepared to answer questions on behalf of the entity.

motion to reopen discovery for deposing Ms. McComber[22] upon the conclusion of her criminal matter,[23] and for another deposition of a Rule 30(b)(6) designee.

Although the court will deny InfoTek's motion for the reasons already stated, Mr. Preston's limited access to discovery provides an independent justification for denying summary judgment at this time. The court may deny a motion for summary judgment when certain facts are unavailable to the non-moving party. *See* Fed. R. Civ. P. 56(d). Although Mr. Preston's counsel has not submitted an affidavit or declaration as contemplated by Rule 56(d), the court is still inclined to deny summary judgment on this basis. To be sure, the Fourth Circuit places "great weight" on the affidavit requirement, *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996), but it has "not always insisted" on a formal affidavit. *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). Indeed, the Fourth Circuit has excused non-compliance with Rule 56(d) "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." *Id.*

Here, Mr. Preston's counsel adequately informed the court of the need for more discovery. Nearly every section of his opposition to InfoTek's motion for summary judgment (ECF 84-1, Def. Opp'n, at 2, 5, 7), as well as several other filings (ECF 39, Def. Mot. to Dismiss; ECF 69, Def. Opp. to Mot. to Stay, at 5; ECF 93, Def. Mot. to Reopen Disc.), reference Mr. Preston's lack of meaningful discovery. Accordingly, Mr. Preston's lack of access to Ms. McComber's

---

[22] InfoTek consents to Mr. Preston taking a "limited deposition of Ms. McComber after the completion of her criminal proceedings, so long as: (1) [Mr. Preston] reimburses [InfoTek] for the legal fees, costs and expense associated with Ms. McComber's first deposition; and (2) the second deposition is narrowly tailored to the specific facts and topics that remain relevant to the then-remaining issues in this case." (ECF 94, InfoTek Opp'n to Def. Mot. to Reopen Disc.) The court will not order Mr. Preston to reimburse the fees and costs from Ms. McComber's first deposition, so long as the second deposition is narrowly tailored to the then-remaining issues in this case.

[23] The court need not reach the issue at this time, but an adverse inference may be appropriate if Ms. McComber continues to assert the Fifth Amendment in this case. Unlike criminal proceedings, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *see also ePlus Techn., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002).

deposition, and the lack of a meaningful Rule 30(b)(6) deposition, provide alternative grounds for denying InfoTek's motion.

## CONCLUSION

For these reasons, the court will deny InfoTek's motion for partial summary judgment, and grant Mr. Preston's motion to reopen discovery. A separate Order follows.

9/9/22
Date

_____
Catherine C. Blake
United States District Judge