**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| INFOTEK CORP.,<br>*Plaintiff*,<br>v.<br>DWAYNE PRESTON,<br>*Defendant* | Case No. 18-cv-1386-ABA |

**MEMORANDUM OPINION**

Defendant Dwayne Preston worked as Chief Financial Officer for Plaintiff Infotek Corporation, a Maryland-based information technology company. Infotek's CEO, President and sole shareholder was Jacky McComber (at that time, Jacky Kimmel). On July 19, 2017, after Mr. Preston resigned and then after Infotek fired his wife (who also worked for the company), Mr. Preston used Ms. McComber's log-in information, which he had obtained as Infotek's CFO but was still saved on his cell phone, ECF No. 134-5 at 7 ¶ 5, to access Infotek's timekeeping software, Unanet. He made some minor changes, for certain employees increasing their accrued paid time off and/or changing their billing rates. Mr. Preston was not authorized to access Unanet or make those changes. Infotek discovered those alterations and reversed them within a week or two.

Since then, Ms. McComber was prosecuted and convicted for submitting false claims and making false statements to the U.S. government. Her conviction and 13-month sentence were upheld on appeal. But before her indictment, Infotek had sued Mr. Preston, seeking to recover from him the costs of investigating his unauthorized electronic intrusion. The case was on hold for a while due to the criminal case, and now Mr. Preston has filed a motion for summary judgment. For the following reasons, that motion will be granted in part and denied in part.

## I. BACKGROUND

Several opinions have been issued in this case previously that lay out the allegations in the complaint, and the procedural history of the case as of those dates. The Court will not repeat all of the ground covered in those opinions, but rather will assume the parties' familiarity with them: *InfoTeK Corp. v. Preston*, Case No. 18-cv-1386-CCB, 2021 WL 4521330 (D. Md. Oct. 4, 2021) ("*InfoTeK I*") (denying Infotek's August 2021 motion to stay); *InfoTeK Corp. v. Preston*, 626 F. Supp. 3d 885 (D. Md. 2022) ("*InfoTeK II*") (reopening discovery and denying Infotek's motion for partial summary judgment); *InfoTeK Corp. v. Preston*, 760 F. Supp. 3d 347 (D. Md. 2024) ("*InfoTeK III*") (addressing Ms. McComber's Fifth Amendment privilege, and denying Infotek's renewed for a motion say).[1]

Those are in addition to several opinions issued by Judge Hollander in the criminal case. This Court also assumes the parties' familiarity with that record. Very little from the criminal case has bearing on the currently pending motion for summary judgment in this case, but the following opinions have the most bearing, and some are cited below where relevant: *United States v. McComber*, Case No. 21-cr-36-ELH, 2021 WL 5760731 (D. Md. Dec. 3, 2021) (denying motion for a bill of particulars); *United States v. McComber*, Case No. 21-cr-36-ELH, 2024 WL 1243851 (D. Md. Mar. 22, 2024) (post-trial opinion denying defense motion for a judgment of acquittal); *United States v. McComber*, Case No. 21-cr-36-ELH, 2024 WL 4664630 (D. Md. Nov. 4, 2024) (denying

---

[1] In the briefing, the parties spell the company's name as "Infotek." The complaint spells it "InfoTek." ECF No. 1. The employees' email signatures spell it "InfoTeK." *See, e.g.*, ECF No. 135-19 at 2. Mr. Preston and the government refer to it as "ITK." *See, e.g.*, ECF No. 134-4 at 7. The Court will adopt counsel's spelling, but all variations refer to the same company: Plaintiff.

defense motion for a stay of incarceration pending appeal); *United States v. McComber*, Case No. 24-4376, 2026 WL 266808 (4th Cir. Feb. 2, 2026) (affirming conviction and sentence).

Following this Court's December 2024 order ruling on Ms. McComber's Fifth Amendment privilege, *InfoTeK III*, 760 F. Supp. 3d at 355–58, in January 2025 the parties filed a joint status report regarding completing outstanding discovery. ECF No. 129. The Court set a deadline to complete discovery, and a deadline for dispositive motions. The parties have completed discovery, and Mr. Preston has filed a motion for summary judgment (ECF No. 134) to which Infotek filed an opposition (ECF No. 135). No reply brief was filed. The evidentiary record, recounted in the light most favorable to Infotek, *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), demonstrates as follows:

For a period of time, Infotek held a contract to provide services to the National Security Agency (NSA). Infotek used a system called Unanet for its employees to track their hours worked and their accrued paid time off leave (PTO). ECF No. 134-5 at 7 ¶ 2 (Statement of Facts attached to July 5, 2021 Non-Prosecution Agreement ("NPA") between Mr. Preston and the U.S. Department of Justice).[2] Mr. Preston, a certified public accountant, was the Chief Financial Officer (CFO) of Infotek from September 2, 2008 through March 31, 2017. ECF No. 134-5 at 7 ¶ 1.[3] "On occasion" Ms. McComber

---

[2] Except for transcript page numbers, the court will cite to ECF pagination, which may differ from the page numbers used by the parties.

[3] It does not appear that Infotek has *admitted* to the facts in the NPA's statement of facts. But Infotek has not identified any evidence in the summary judgment record that contradicts any of the facts stated in this opinion that appear in the statement of facts attached to the NPA.

"asked Mr. Preston to use her sign-in credentials to go into the Unanet system and set up reports for her." *Id.* ¶ 2. "Because of these requests, Mr. Preston knew how to access the Unanet system using Ms. [McComber's] credentials." *Id.* In addition, during Mr. Preston's time as Infotek's CFO, periodically Ms. McComber's ex-husband Robert Kimmel, who had been a co-owner of Infotek until late 2016 and had continued working as a subcontractor, "would . . . ask Mr. Preston to use his sign-in credentials to access the system and check whether his time had been recorded correctly." *Id.* ¶ 3.

In early March 2017, Mr. Preston notified Ms. McComber "that he would be resigning as CFO effective March 31, 2017." *Id.* ¶ 5. Mr. Preston's "administrative rights that allowed him to access the company's Unanet system under his own name were terminated," but his "cell phone still cached both Ms. Jacky [McComber's]'s and Robert Kimmel's sign-in credentials, and he thus retained the ability to continue to access [Infotek's] Unanet system." *Id.*

Mr. Preston's wife, Jamie Preston, continued to work at Infotek after Mr. Preston's departure. *Id.* ¶ 6. In late June 2017, Ms. Preston was notified that her employment was being terminated. *Id.* at 8 ¶ 9. "Mr. Preston was angry at Ms. [McComber] about his wife's firing and . . . he still had the ability to access [Infotek's] Unanet software system by making use of Ms. [McComber's] credentials." *Id.* ¶ 10. So between 10:02 and 10:44 p.m. on July 19, 2017, he "went into the personnel records of several individuals and gave them additional days of paid time off (PTO) because he believed those employees had been improperly required to use leave in the past"; "went into certain labor categories and changed the rates by transposing numbers . . . knowing that this would cause complications when the contracts were closed out and it was necessary to run a final report"; "transposed [certain] labor rates on both active and

inactive contracts"; and "accessed and viewed the time records of various other employees, including Ms. [McComber], to verify if she was improperly billing the government." *Id.* ¶ 11.

Sometime between July 19 and July 24, several Infotek employees observed some changes in Unanet to their accrued PTO that they had not authorized. ECF No. 135-7 at 5; *see also* ECF No. 135-5 ¶ 2 (Affidavit of Sean McComber). That prompted Infotek, with "help" from Ashton-Group Services ("AGS"), to begin looking into how the PTO accruals had changed. ECF No. 135-1 at 6. The summary judgment record provides little information about what services AGS provided Infotek. AGS's invoices are not itemized and there is no other evidence in the record describing the nature of the services that AGS provided to Infotek generally, other than that the titles of the AGS personnel whose work was billed to Infotek were all financial services professionals (*e.g.*, "Staff Accountant," "Accounting Manager," "CFO"). ECF No. 135-6 at 2–24. The record also does not contain evidence of specifically what AGS did in connection with the July 2017 intrusion other than a single email chain on July 27, 2017. ECF No. 135-7. In any event, Infotek contends that it, with AGS's "help," "reviewed available Unanet data and user logs and discovered that between approximately 10:05PM and 10:45PM on July 19, 2017, an unauthorized user gained access to the Unanet system using the user account 'JACKY.KIMMEL' and with administrative privileges accessed and made changes to and within the Unanet system." ECF No. 135-1 at 6.[4]

[4] This assertion—specifically related to AGS's alleged work between July 24 and 27, 2017—is not accompanied by evidence. For example, the AGS invoice for July 2017, ECF No. 135-6 at 7, does not support that contention because, as noted above, that invoice is not itemized and because the amount billed for that month was roughly the same as a number of prior months. *See, e.g.*, *id.* at 6 (AGS invoice for June 2017). But the Court

On July 27, 2017, an AGS account manager who was working with Infotek reached out to Unanet for assistance. ECF No. 135-7 at 5. She noted that on July 19 (eight days prior) "several employees received adjustments to their leave erroneously" and requested Unanet's support "find[ing] out where this was initiated from." ECF No. 135-7 at 5. She also noted, "It is our concern that a recently separated employee, who may have had [Ms. McComber's] log in and password fraudulently made the adjustments." *Id.* Thus, by July 27, 2017, Infotek already had a specific "concern" that Mr. Preston was the person who had "made the adjustments." *Id.* at 5.

In August 2017, Infotek retained the law firms Pargament & Hallowell, PLLC, and Offit Kurman P.A. As will be explained below, the timing and nature of that work is significant within the context of the current summary judgment motion.

Pargament's timekeeping records reflect that on August 3, 2017, Ms. McComber reached out to that firm "regarding corporate sabotage." ECF No. 135-6 at 26. Pargament billed a total of $1,138.50 between August and October 2017 for its representation of Infotek in what it described as the "corporate breach" matter. *Id.* It also billed time for its work on the "Dwayne Preston Lawsuit" beginning November 10, 2017. *Id.* at 28.

Offit Kurman's billing records as filed in this case reflect that its work for Infotek began on August 11, 2017—by which point Infotek already had identified Mr. Preston as the likely person who had made the alterations. ECF No. 135-7 at 5; ECF No. 135-6 at 44 (attorney April M. Rancier entry "regarding claim against John Doe for changing PTO

---

will accept this assertion as inferred facts supported by other evidence in the record, in particular the July 27, 2017 email from AGS to Unanet (ECF No. 135-7).

information in client's software" and attorney Timothy Lynch entry regarding meeting with Ms. Rancier "re: payroll issues" and "memo to client re: same"). Infotek has identified various Offit Kurman billings as caused by Mr. Preston's incursion, including $5,877.50 in August 2017, $414 in September 2017, $4,726 in October 2017, $10,437 in November 2017, $3,882 in December 2017, and $3,186 in January 2018. ECF No. 135-6 at 46–50.

Around this same time, a whistleblower came forward to report to the NSA that Ms. McComber had been fraudulently overbilling the NSA. ECF No. 93-3 at 3–4. Although the letter was written anonymously, the author has since been identified as "Shilo Weir, [Infotek's] chief operations officer and second in command." *McComber*, 2026 WL 266808 at *2. Around the same time, however, Mr. Preston also "submitted an online whistleblower tip to the federal government describing Ms. McComber's alleged misconduct related to billing and recordkeeping." *Infotek II*, 626 F. Supp. 3d at 890 n.4 (citing ECF No. 85-2 at 155:19–156:19 & 157:4–158:1).

On August 30, 2017, Offit Kurman filed a lawsuit on Infotek's behalf in the Circuit Court for Anne Arundel County. ECF No. 135-10. This was one week after the NSA received the whistleblower complaint, but apparently before the investigation had been brought to Infotek's attention. Although six weeks before filing the lawsuit Infotek had identified Mr. Preston as the likely person to have made the adjustments, ECF No. 135-7 at 5, Infotek apparently was not sufficiently confident of that assessment to name Mr. Preston as a defendant in that lawsuit. Instead, the lawsuit was filed against "John Doe" and alleged that, "[u]pon information and belief, Defendant obtained and used [McComber's] Unanet login credentials without her permission and made unauthorized and inaccurate alterations to the PTO accruals of Plaintiff's employees." ECF No. 135-10

¶ 15. The complaint alleged that Infotek "believe[d] that it will be able to confirm the identity of Defendant through discovery." *Id.* ¶ 16. Infotek alleged that Preston (at that point, identified as "John Doe") had made certain changes in Unanet's system "using [McComber's] Unanet log-in credentials," specifically that one employee's "PTO leave" had been "increased" for a particular pay period in July 2017, and that another was "being compensated" for PTO that the employee "did not take." *Id.* ¶¶ 7–8, 11. The complaint asserted three causes of action: fraud, misappropriation of trade secrets under the Maryland Uniform Trade Secrets Act, and trespass to chattels. *Id.* at 7–8.

In September 2017, after filing the Circuit Court case, Offit Kurman issued a subpoena to Verizon, for records associated with the IP address from which Unanet had been accessed using Ms. McComber's credentials. *See* ECF No. 135-6 at 46 (time records regarding drafting the subpoena on September 7, 2017).

In the meantime, Ms. McComber learned that the NSA was investigating Infotek for overbilling—and in particular for overbilling Ms. McComber's work under the contract. On October 2, 2017, a Senior Investigator with the NSA's Office of the Inspector General wrote, "Jacky, I'm an Investigator with the NSA Office of the Inspector General. Our office received an allegation concerning labor mischarging—*specifically with your hours*. Please give me a call or respond to this email to set up a time that we can talk and resolve this complaint." ECF No. 135-19 at 5 (emphasis added).

So to recap three events thus far that are critical to the analysis herein:

- By July 27, 2017, Infotek strongly suspected that Mr. Preston had been the person responsible for the PTO adjustments. ECF No. 135-7 at 5.

- On August 23, 2017, the whistleblower reported Ms. McComber's then-alleged (and since proven) overbilling to the NSA. ECF No. 93-3.

- By October 2, 2017, Ms. McComber knew that the NSA was investigating her for "labor mischarging." ECF No. 135-19 at 5.

Then, sometime on or before October 23, 2017, Verizon produced the data that had been requested in the Infotek subpoena. ECF No. 135-6 at 46 ("Reviewed information received from Verizon and analyzed the same in preparation for advising the client."). On November 8, 2017, Infotek retained Atlantic Data Forensics, Inc. ("ADF"), a computer forensics firm. ECF No. 135-8 at 4. ADF received data from two Infotek computers on November 16. ECF No. 135-6 at 65. On November 20, it received data that had been produced by Verizon pursuant to the subpoena. ECF No. 135-9 at 2. ADF analyzed the data that Verizon had produced, and confirmed that Mr. Preston was the person who logged into Unanet using Ms. McComber's login information. ECF No. 135-8 at 6, 13; ECF No 135-9 at 2 ¶ 3.

ADF reported its "preliminary results from investigation" on December 1, 2017. ECF No. 135-6 at 49. These findings, based on the data that ADF received on November 20, 2017, were confirmed through ADF's subsequent analysis of certain "computer usage log files" that ADF received from Unanet on January 18, 2018. ECF No. 135-9 at 2 ¶ 4 ("ADF's forensic analysis of these log files showed on 7/19/17 from 10:02PM EDT to 10:42PM EDT the IP address 174.204.5.244 assigned to Dwayne Preston's Verizon Wireless cell phone gained unauthorized access to the Infotek Unanet timekeeping system using the login 'JACKY.KIMMEL' with administrator privileges and accessed timekeeping records.").

Although the written reports from ADF in the record (ECF No. 135-8 and 135-9) are dated November 15, 2018 and February 22, 2019, respectively, the undisputed evidence in the record described above establishes that ADF had reported to Infotek no later than December 1, 2017, that it had confirmed that Mr. Preston was the person who had accessed the system. ECF No. 135-9 at 2 ¶ 3; ECF No. 135-6 at 49 (time record of Infotek's counsel April Rancier: "Conference call with Atlantic Data regarding preliminary results from investigation; Conference call with client regarding the same and filing of complaint; Reviewed email from forensic expert and drafted response to the same; Reviewed order from state court and drafted memo regarding strategy for responding to the same.").

Infotek filed an amended complaint in its Circuit Court case on February 8, 2018, naming Mr. Preston as the defendant. ECF No. 135-11. The amended complaint maintained the three causes of action that Infotek had originally asserted: fraud, misappropriation of trade secrets under the Maryland Uniform Trade Secrets Act, and trespass to chattels. *Id.* at 5–7.

On May 14, 2018, Infotek moved its case against Mr. Preston to federal court. The federal complaint (ECF No. 1) added claims under federal law. That complaint, which remains the operative complaint in this Court, asserted seven counts: three under federal law (counts 1–3) and four under state law (counts 4–7). Plaintiff has since consented to dismissal with prejudice of Counts 2, 3, 5, 6 and 7. ECF No. 135-1 at 2. That leaves Count 1 under Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and Count 4, which alleges trespass to chattels under Maryland common law.[5]

---

[5] The full set of claims originally asserted against Mr. Preston were (1) Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (2) Violation of the Defend Trade Secrets Act of 2016,

Infotek took a "preliminary deposition" of Mr. Preston on November 12, 2018. Mr. Preston denied that he had used someone else's administrative rights to access Unanet. ECF No. 135-12 at 8–9 (transcript at 22:12–27:10). Mr. Preston later admitted that some of that testimony was not truthful. ECF No. 134-5 at 10 ¶ 16. Infotek contends that because of that untruthful testimony in November 2018, Infotek's "investigation" was "significantly frustrated and impaired," requiring it to "continue to conduct additional discovery and to authorize ADF to prepare a computer forensic report based on the information that it had obtained in discovery." ECF No. 135-1 at 8. That led to ADF preparing its formal report, which was submitted in February 2019.

Discovery in this case continued. Then, on February 25, 2021, Ms. McComber was indicted with two sets of charges. The indictment alleged that Infotek was "a company that was in the business of providing information technology, engineering, and security management services to government agencies and commercial companies," of which McComber was CEO, president, and sole shareholder. *United States v. McComber*, Case No. 21-cr-36-ELH, ECF No. 1 (Feb. 25, 2021) at 1–2.[6] Infotek had an "ongoing contract" with the NSA, referred to as the Ironbridge contract, to provide "maintenance and enhancement support for the information technology and software requirements of the NSA's National Security Operations Center (NSOC) and the Counter

18 U.S.C § 1836; (3) Federal Unfair Competition in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (4) Trespass to Chattels; (5) Misappropriation of Trade Secrets against Defendant in Violation of Maryland's Uniform Trade Secrets Act Md. Code Ann., Com. Law § 11-1201; (6) Tortious Interference with Business Relations; and (7) Tortious Interference with Economic Relations.

[6] Although Infotek continues to exist as an entity, having filed "Articles of Revival" with the Maryland Department of Assessments & Taxation in November 2024, there is no evidence in the record of this case of it doing any business in recent years.

Terrorism Mission Management Center (CTMMC).” *Id.* at 2. Infotek employees used the “web-based timesheet software program provided by Unanet, Inc.” to “record their billable time on the matters on which they worked.” *Id.* at 3.

Counts 1 through 19 of the indictment charged Ms. McComber with submitting false invoices between April 2016 and October 2017 for her work under the Ironbridge contract. *Id.* at 7.[7] In addition, Count 20 charged Ms. McComber with giving false statements to investigators of the NSA’s Office of the Inspector General during an interview on October 3, 2017, when she stated that her time records under the Ironbridge contract were accurate. *Id.* at 9–10.

Ms. McComber’s initial appearance and arraignment in the criminal case was March 8, 2021. *United States v. McComber*, Case No. 21-cr-36-ELH, ECF Nos. 4–5. At the time of her indictment, through the sixteen-day jury trial in January–February 2023, and until June 2023, Ms. McComber was represented by retained counsel, Clark Ahlers. *Id.*, ECF No. 14; *see also id.*, ECF No. 330 (June 1, 2023 motion to strike Mr. Ahlers’ appearance).

On July 5, 2021, about four months after Ms. McComber’s indictment, Mr. Preston signed a non-prosecution agreement with the federal government. Mr. Preston stipulated to certain facts set forth in Attachment A to that agreement, ECF No. 134-5 at 7–11, some of which are recounted above. Mr. Preston also admitted that he had lied on several occasions during his November 2018 deposition, including when he “denied having used his cell phone to access any information in [Infotek’s] Unanet timekeeping

[7] At sentencing, Judge Hollander found that Ms. McComber’s fraud had resulted in $176,913 in losses to the NSA. *See McComber*, 2026 WL 266808 at *3, *12–*13 (Fourth Circuit’s affirmance regarding the loss amount).

software system," and when he "stated that he had no knowledge of anyone contacting the government to report improper contract billing practices on the part of Ms. [McComber] or [Infotek] (Deposition at 92), although Mr. Preston had already done so at that time." *Id.* at 10 ¶ 16. He also admitted to having made "additional false statements relating to an interview he had with government representatives on March 16, 2018." *Id.* at 10 ¶ 17.

A few days after signing the non-prosecution agreement, Mr. Preston signed a four-page errata sheet, containing numerous "correction[s]" to his deposition testimony, including various changes that substantively changed his testimony. ECF No. 135-15. The errata sheet was signed on July 9, 2021. *Id.* at 5. That was a few weeks after Judge Hollander had set a trial date in the criminal case for the following spring, a trial at which the government planned to call Mr. Preston as a witness against Ms. McComber. *See McComber*, Case No. 21-cr-36-ELH, ECF No. 16 (June 4, 2021 order setting trial for April 4, 2022).[8]

On November 23, 2021, Mr. Preston took a deposition of Infotek's corporate designee pursuant to Federal Rule of Civil Procedure 30(b)(6). ECF No. 134-4. The person Infotek had designated to testify on its behalf was T.J. Crews. Mr. Crews did not work for Infotek but had been designated by Infotek to testify on its behalf and had met with Infotek's counsel and reviewed some documents in the days leading up to the deposition to prepare. *Id.* at 3 (6:1–7:2, 9:7–12). There were many questions to which Mr. Crews lacked information to respond. In January 2022, Infotek filed a motion for

---

[8] The government did end up calling Mr. Preston as a witness at the trial, which after being rescheduled took place from January 19 to February 15, 2023. *See* ECF No. 302 (February 7, 2023 trial transcript) at 26–182.

partial summary judgment, which was denied in September 2022. ECF Nos. 80, 95; *Infotek II*, 626 F. Supp. 3d 885.

The criminal trial against Ms. McComber took place in January–February 2023. The jury convicted Ms. McComber on all 20 counts that had been charged. *United States v. McComber*, Case No. 21-cr-36-ELH, ECF No. 279. A three-day sentencing hearing was held on June 26–28, 2024. *Id.*, ECF Nos. 489–491. On July 1, 2024, Ms. McComber was sentenced to 13 months of incarceration and two years of supervised release. *Id.*, ECF No. 493.

As noted above, following Ms. McComber's sentencing but before her appeal was decided, this Court ruled that discovery would continue (and conclude), but that because of the pendency of the appeal and the possibility of further proceedings, Ms. McComber was permitted to assert her privilege against self-incrimination. *InfoTeK III*, 760 F. Supp. 3d at 355. The Court also explained, however, that *if* Ms. McComber were to invoke her Fifth Amendment privilege against self-incrimination in response to deposition questions, that invocation may give rise to adverse inferences in this case. *Id.* at 358–59.

On June 12, 2025, Ms. McComber testified as the designated corporate representative of Infotek. ECF No. 134-3. At that deposition, Ms. McComber invoked her Fifth Amendment privilege against self-incrimination in response to almost every question—approximately 200 times. *Id.*

The Fourth Circuit affirmed Ms. McComber's conviction and sentence in February 2026. *United States v. McComber*, No. 24-4376, 2026 WL 266808 (4th Cir. Feb. 2, 2026).

Meanwhile, this case continues. The Court need not recount the entire procedural history, but of particular salience is the fact that this is the second opinion deciding a summary judgment motion. Earlier in the case, Plaintiff Infotek filed a motion for partial summary judgment. Judge Blake (who previously presided over this case) denied that motion in September 2022. *Infotek II*, 626 F. Supp. 3d 885. At that time, Judge Blake observed, among other things, that the record included a November 29, 2021 deposition of Ms. McComber in her personal capacity—not as corporate designee—in which she, as later when testifying in a corporate designee capacity, "invoke[d] the Fifth Amendment in response to essentially every question." *Id.* at 891. Judge Blake also noted that "[t]he parties dispute whether [Offit Kurman, AGS and ADF] were hired mainly to investigate the Unanet intrusion or to construct a defense against the NSA's probe." *Id.* at 890.

Mr. Preston contends that the sole reason Infotek and Ms. McComber continued to litigate this case (and to seek repeated delays) during the pendency of the criminal case was "to confuse the Government, and a potential judge or jury, by attempting to link Defendant's minor intrusion with her massive and multi-year fraud." ECF No. 134-1 at 4; *see also id.* (describing this case as "an over seven-year (successful) campaign of staying this matter without a final decision in order to further Ms. McComber's red-herring defense while providing no meaningful discovery and obstructing and delaying the forward progress of this case").

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party meets its burden when the nonmovant "fails to make a showing

sufficient to establish the existence of an element essential to that party's case" and when the nonmovant bears "the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving party fails to confront the motion with "sufficient evidence . . . for a jury to return a verdict for that party," the movant is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Matsushita*, 475 U.S. at 587 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). In making this determination, the Court views all facts, and all reasonable inferences drawn from those facts, in the light most favorable to the nonmoving party (here, Infotek). *Matsushita*, 475 U.S. at 587–88.

## III. DISCUSSION

Following Infotek's withdrawal of most of the counts in its complaint, the remaining counts are Count 1, under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*. ("CFAA"), and Count 4, for trespass to chattels.[9] Mr. Preston's motion seeks summary judgment on those counts in two ways. First, he argues straightforwardly that, based on the admissible evidence in the summary judgment record, there are no genuine disputes of fact, and he is entitled to judgment as a matter of law. Second, he argues that insofar as any material disputes would otherwise preclude summary judgment, Ms. McComber's invocation of her privilege against self-

---

[9] As noted above, Plaintiff has requested leave to voluntarily dismiss Counts 2, 3, 5, 6, and 7 pursuant to Federal Rule of Civil Procedure 41(a)(2). ECF No. 135-1 at 2. That motion will be granted, and accordingly those counts will be dismissed with prejudice.

incrimination while she was testifying on behalf of Infotek entitles Mr. Preston to adverse inferences against Infotek that independently establish that no reasonable jury could find in Infotek's favor on either count.

The Court begins by analyzing whether, *absent* the consequences of Ms. McComber's Fifth Amendment invocations while testifying on behalf of Infotek, Mr. Preston would be entitled to summary judgment, and then analyzes the impact of the adverse inferences to which Mr. Preston is entitled based on those invocations.

### A. Computer Fraud and Abuse Act (Count 1)

The CFAA prohibits, among other things, any person from "intentionally access[ing] a protected computer without authorization." 18 U.S.C. § 1030(a)(5)(C). "[A]n employee . . . accesses a computer 'without authorization' when [s]he gains admission to a computer without approval." *WEC Carolina Energy Sols., LLC v. Miller*, 687 F.3d 199, 204 (4th Cir. 2012). A person who has "suffer[ed] damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief," so long as the violation involved conduct described in one of the subclauses of subsection (c)(4)(A)(i), 18 U.S.C. § 1030(g), and the loss or damage "aggregate[s]" to "at least $5,000 in value[.]" *id.* § 1030(c)(4)(A)(i)(I).

Mr. Preston does not dispute that he "accessed Plaintiff's timekeeping software, Unanet, using the login credentials of Ms. McComber on July 19, 2017." ECF No. 134-1

at 14. He argues he is entitled to judgment as a matter of law on Count 1, however, because Plaintiff has not suffered a "loss" within the meaning of the CFAA. *Id.*[10]

The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring . . . the system . . . to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C § 1030(e)(11). A "loss" under the CFAA "contemplates consequential damages . . . [and] costs incurred as part of the response to a CFAA violation, including the investigation of an offense." *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009) (citing *Modis, Inc. v. Bardelli,* 531 F. Supp. 2d 314, 320 (D. Conn. 2008); *SuccessFactors, Inc. v. Softscape, Inc.,* 544 F. Supp. 2d 975, 980–81 (N.D. Cal. 2008)).

Although "the Fourth Circuit in *iParadigms* did not elucidate the causal requirement, the Supreme Court has construed federal statutes containing similar requirements to incorporate traditional principles of tort causation, and such a reading is consistent with *iParadigms*." *Glob. Pol'y Partners, LLC v. Yessin*, 686 F. Supp. 2d 642, 647 (E.D. Va. 2010) (footnotes omitted). "It follows, therefore," that plaintiffs seeking to recover damages for CFAA violations "must show that the losses they claim were the reasonably foreseeable result of the alleged CFAA violations, and that any costs incurred as a result of measures undertaken to restore and resecure the . . . system were reasonably necessary in the circumstances." *Id.* (citing *United States v. Middleton,* 231 F.3d 1207, 1213 (9th Cir. 2000)); *see also Infotek II*, 626 F. Supp. 3d at 892 (explaining

---

[10] Infotek proceeds "under a 'loss' theory, rather than a 'damage' theory, likely because [it] was able to undo Mr. Preston's alterations in Unanet before the company paid out extra PTO." *Infotek II*, 626 F. Supp. 3d at 892 n.9.

that to recover a "loss" under the CFAA, a plaintiff "must also prove that the costs were reasonably necessary and causally related to the CFAA violations") (citing *Glob. Pol'y Partners*, 686 F. Supp. 2d at 647–48); *Middleton*, 231 F.3d at 1213 (approving jury instruction on CFAA causation that focused on whether "measures were reasonably necessary to restore" or "resecure" the "data, program, system or information" at issue).

Recoverable damages can include costs incurred in "the investigation of an offense," *A.V. ex rel. Vanderhye*, 562 F.3d at 646, along with "the cost of remedial measures taken to investigate or repair the damage to the computer," *Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) (quoting *Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio,* Case No. 11-cv-995-ABB, 2011 WL 6088611, at *5 (E.D. Pa. Dec. 7, 2011)); *see also Moxie Pest Control (Utah), LLC v. Nielsen*, 164 F.4th 1195, 1200 (10th Cir. 2026) (holding that "investigative costs" are recoverable only where they were "reasonably necessary *to respond* to [a CFAA] offense, for example by identifying the perpetrator or the method by which the offender accessed the protected information") (citation omitted).

Applying these standards, some courts have identified certain costs that are generally not recoverable, such as "fees paid to assist in litigation." *Infotek II*, 626 F. Supp. 3d at 894 n.13; *see also Brooks*, 954 F. Supp. 2d at 338 (holding that "litigation costs" are generally "not a compensable loss under the CFAA" where "they are not related to investigating or remedying damage to the computer"); *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 268 n.6 (N.D. Ill 2020) (explaining that fees for "attorneys charged with supervising an incident response investigation to determine what wrongdoing occurred might be sufficiently related to the CFAA violation" to be recoverable, but "legal fees to prepare for the resulting litigation" would generally be too

"attenuated"). Similarly, in general "fees paid to an expert to assist in litigation" are not recoverable, for the same reason. *Brooks*, 954 F. Supp. 2d at 338 (citing *Mintel Int'l Group, Ltd. v. Neergheen,* No. 08–3939, 2010 WL 145786, at *10 (N.D. Ill. Jan. 12, 2010); *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc.,* 616 F. Supp. 2d 805, 812 (N.D. Ill. 2009)); *but see Modern Remodeling, Inc. v. Tripod Holdings, LLC*, 477 F. Supp. 3d 399, 402, 407 (D. Md. 2020) (explaining that although certain experts in that case "provided litigation services" to the plaintiff, they also spent time "analyzing the laptops at issue" in connection with the "investigation into what information had been accessed and destroyed"). The courts that have held that litigation costs are not CFAA "losses" have reached that conclusion based principally on the language of § 1030(e)(11), which is not a general fee-shifting provision, but rather is limited to costs of "responding," "assess[ing]," and "restoring" the "system" along with "any revenue lost, cost incurred, or other consequential damages incurred *because of interruption of service*." 18 U.S.C § 1030(e)(11) (emphasis added); *see, e.g.*, *Mintel*, 2010 WL 145786, at *10; *Del Monte*, 616 F. Supp. 2d at 812.

In this case, Infotek has stipulated that it does not seek any lost profits as damages. ECF No. 134-4 at 5–6 (17:5–6; 17:20–18:1). Instead, it seeks to recover funds that it paid two law firms and two consulting firms for services rendered between 2017 and 2019. Infotek contends that the payments to these entities were "incurred in response to Defendant's CFAA violation" (ECF No. 135-1 at 11):

- Pargament & Hallowell – August 3, 2018 through December 13, 2018 (ECF No. 135-6 at 26–29);
- Offit Kurman – August 11, 2017 through September 20, 2019 (*id*. at 44–63);

- Ashton-Group Services – February 1, 2017 through December 31, 2018 (*id.* at 2–24); and
- Atlantic Data Forensics – November 13, 2017 to June 25, 2019 (*id.* at 64–90).

In addition, Infotek seeks to recover what it describes as "the value of the Unanet software during the course of Defendant's intrusions, which began before April 2017, through the span of Infotek's investigation, which continued beyond at least December 2021 (the date of Defendant's second deposition)," along with the costs of "mov[ing] to another platform within Unanet with enhanced and grater security, which resulted in Infotek incurring substantial additional fees." ECF No. 135-1 at 11 (citing ECF No. 135-18, constituting Unanet invoices from June 2017 through November 2021).

Mr. Preston argues that none of these costs constitute "losses" within the meaning of CFAA because "the investigation using any third party began after the whistleblower complaint" and Infotek "corrected any modifications to employee PTO prior to any mistaken payments." ECF No. 134-1 at 14 (citing first 30(b)(6) deposition, ECF No. 134-4 at 50:15–51:3, 53:13–19, 75:8-17, 80:5–12).[11]

As an initial matter, any expenses incurred **before July 2017** clearly bear no nexus to Mr. Preston's use of Ms. McComber's log-in information on July 19, 2017, to change employees' PTO accruals. The invoices that Infotek submits among its evidence of losses incurred include AGS and Unanet services in or before June 2017. Those do not constitute CFAA-recoverable damages as a matter of law.

---

[11] Mr. Preston also moves for summary judgment to the extent Infotek seeks to recover attorneys' fees paid "for the defense of Ms. McComber's Criminal Timekeeping Action." ECF No. 134-1 at 14. In its response, Infotek states that it does not seek recovery of any fees charged by her counsel in the criminal case. ECF No. 135-1 at 11. So that aspect of Mr. Preston's motion is moot.

At the other end of the timeframe, Infotek also has pointed to no evidence from which a reasonable jury could find that payments incurred **after December 1, 2017** were "consequential damages . . . [or] costs incurred as part of the response to a CFAA violation, including the investigation of an offense." *A.V. ex rel. Vanderhye*, 562 F.3d at 646. That was the day ADF confirmed and reported to Infotek that Mr. Preston's cell phone had been used to make the PTO accrual and billing rate edits. ECF No. 135-9 at 2 ¶ 4. Infotek already believed that Mr. Preston had been the person responsible—and had believed that for months. By July 27, 2017, just two weeks after Mr. Preston used Ms. McComber's log-in information, Infotek informed AGS that it believed "a recently separated employee" was the person who "made the adjustments." ECF No. 135-7 at 5. The evidence in the record identifies only one such "recently separated employee": Mr. Preston. And when Infotek filed its original "John Doe" complaint, it described the purpose of the lawsuit as necessary to "*confirm* the identity of Defendant." ECF No. 135-10 ¶ 16 (emphasis added). But it was not until on or shortly before December 1, 2017 that Infotek, through ADF using the Verizon records produced via subpoena, was able to forensically confirm that Mr. Preston had been the person responsible. Moreover, the undisputed evidence in the record establishes that to the extent there was any "interruption" to Infotek's access to Unanet or other Infotek systems, such interruption had ceased within days or weeks of the July 2017 intrusion, and there were no other "respon[se]" or "assessment" that was reasonably necessitated by the intrusion. *See* 18 U.S.C § 1030(e)(11).

Infotek's principal argument for why it should be permitted to present to a jury expenses incurred after December 1, 2017 is that during a preliminary deposition in November 2018 Mr. Preston "lied, repeatedly and substantially," and "provided

knowingly [a] false and fabricated story, alleging that after he left Infotek, he only accessed Unanet to help his friend, Bobby Kimmel, with his invoices[,] at which time Defendant would only see and access Mr. Kimmel's time, and nothing else." ECF No. 135-1 at 8. Infotek also points to an expert report that Mr. Preston commissioned in April 2019, which it describes as a "knowingly false and unsupportable 'rebuttal' report of ADF's conclusions," and Mr. Preston's invocation of this Fifth Amendment privilege against self-incrimination in response to written interrogatories. *Id.* at 9 (citing ECF Nos. 135-13, 135-14). Infotek contends that those "lies and misdirection" resulted in increased expenses to "continu[e] its investigation and engage[] in further discovery." *Id.* The problem with that theory, however, is that, as noted above, the CFAA does not provide for fee-shifting in litigation. Instead, in pertinent part the CFAA limits Infotek's recovery to "the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Infotek sued Mr. Preston, and it is true that Mr. Preston not only did not immediately admit liability but went so far as to commit perjury at his deposition—which he later admitted to federal prosecutors in connection with the non-prosecution agreement. That conduct certainly does appear to have increased the attorneys' fees that Infotek incurred to continue to litigate this case. But those attorneys' fees in litigation were not costs of "responding to an offense" or "conducting a damage assessment," and also did not constitute "consequential damages incurred because of interruption of service," particularly because there is no evidence in the record that there was any "interruption" in Infotek's ability to use the Unanet service.

Similarly, insofar as Infotek points to its decision to "move to another platform within Unanet with enhanced and gr[e]ater security," ECF No. 135-1 at 11, it has not shown that doing so was necessitated by Mr. Preston's unauthorized access. *See Animators at L., Inc. v. Cap. Legal Sols., LLC*, 786 F. Supp. 2d 1114, 1118 (E.D. Va. 2011) (rejecting a similar argument because the plaintiff company, like Infotek here, did not "cite any facts in the record to indicate why a simple change to the Dropbox passwords would not have remedied the loss attributable to the unauthorized"); *id.* at 1122 (referring to those costs as "insufficiently qualified on this summary judgment record").

That leaves the fees Infotek paid Pergament, Offit Kurman, AGS and ADF for work performed **between July 19 and November 30, 2017**. Did those expenses constitute "losses" that that Infotek "suffer[ed] . . . *by reason of a violation of [the CFAA]*," 18 U.S.C. § 1030(g) (emphasis added)? When the converse question was posed through a motion for summary judgment filed by Infotek, Judge Blake held that there were genuine disputes of fact that precluded summary judgment. That was because "[a] reasonable jury could conclude InfoTek assembled these impressive (and costly) companies not to restore or resecure the Unanet system, but to develop a defense for Ms. McComber against criminal charges." *Infotek II*, 626 F. Supp. 3d at 893.

Now the question is whether Infotek has come forward with evidence from which a reasonable jury could conclude that at least some of the costs that it incurred in 2017 are recoverable under the CFAA. Based on the factual evidence in the record—*i.e.*, before considering the impact of Infotek's Fifth Amendment invocations—the answer is yes. In *A.V. ex re. Vanderhye*, two high schools that used software to detect plagiarism authorized the software provider (Turnitin) to add its students' writings to "the database used by Turnitin to evaluate the originality of other student[s'] works in the future" and

"required students to submit their written assignments via Turnitin.com to receive credit." 562 F.3d at 634–35. One student ("A.V.") who attended McLean High School in Fairfax County, Virginia and who opposed the school's decision to share students' work with Turnitin accessed the website using a password designated for students enrolled at the University of California, San Diego; that password was "provided to A.V. by plaintiffs['] counsel who obtained it by conducting an internet search." *Id.* at 635. After the plaintiffs sued the company that owned and operated Turnitin (iParadigms), iParadigms asserted a counterclaim against A.V. under the CFAA because "when it learned that A.V. was able to register and submit papers as a student of a university in which he was not enrolled and had never attended, it feared the possibility of a technical glitch in the Turnitin system and concluded an investigation was necessary." *Id.* at 645. "Unaware that A.V. had simply obtained a password posted on the Internet, iParadigms assigned several employees to determine what happened." *Id.* The Fourth Circuit held that iParadigms had adequately pled a claim under the CFAA for reimbursement of the "man-hours [that] were spent responding to A.V.'s use of the UCSD password." *Id.* at 645–46.

Other cases, including those described above, have permitted CFAA damages claims to proceed where a reasonable jury could conclude that fees constituted "the cost of responding to an offense, conducting a damage assessment, and restoring . . . the system . . . to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C § 1030(e)(11). *See, e.g.*, *Modern Remodeling*, 477 F. Supp. 3d at 406–07; *Moxie Pest Control*, 164 F.4th at 1200–01; *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*,

774 F.3d 1065, 1073 (6th Cir. 2014); *ExactLogix, Inc.*, 508 F. Supp. 3d at 268; *Animators at Law*, 786 F. Supp. 2d at 1121; *SuccessFactors*, 544 F. Supp. 2d at 981.

Here, there is sufficient evidence from which a reasonable jury could conclude that *some* of the expenses that Infotek incurred in the weeks (or possibly few months) after Mr. Preston's use of Ms. McComber's log-in to modify the PTO accruals and billing rates qualified as "damage or loss" incurred "by reason of" Mr. Preston's CFAA violations. 18 U.S.C. § 1030(g). As noted above, there are four service providers as to which Infotek seeks recovery of fees billed:

**ADF (Atlantic Data Forensics)**. A reasonable jury could conclude that at least some of the work performed by ADF between November 13 and November 30, 2017 (ECF No. 135-6 at 64–66) constituted recoverable losses. ADF was directly responsible for conducting a forensic analysis of the data produced by Verizon in response to the subpoena as well as web server and session logs provided by Unanet. A reasonable jury could conclude that those expenses are recoverable. *See Animators at Law*, 786 F. Supp. 2d at 1121 ("To determine whether unauthorized access in fact occurred and the extent of such access, Animators had the laptop analyzed by IDS. Although defendants contend that such an extensive analysis was neither reasonably foreseeable nor necessary, a reasonable jury might well disagree and conclude otherwise."). The invoices also refer to a forensic analysis of laptop computers; Infotek does not articulate or point to evidence of why that forensic work was necessary or otherwise constituted a reasonably foreseeable cost resulting from Mr. Preston's incursion. But Infotek has shown that there are genuine disputes of material fact with respect to ADF's work between November 13 and November 30, 2017, at least with respect to ADF's forensic analysis of the data from Unanet and Verizon.

**AGS (Ashton-Group Services)**. For the pertinent period (July–November 2017), Infotek has submitted invoices from AGS: $29,751.59 for July, $29,658.58 for August, $23,420.52 for September, $41,585 for October, and $31,868.75 for November. ECF No. 135-6 at 7–11. The invoices are not itemized; they list the title of the AGS employees' time and the number of hours worked, but not any description of the work. Moreover, the vast bulk of AGS's time during those months was spent by "staff accountants" and a "bookkeeper." *Id.* An affidavit from Sean McComber lumps together AGS with ADF, Offit Kurman and Pergament & Hallowell and describes them collectively as having "assist[ed] it in investigating and responding to the source, cause, and effect of this apparent cyber-attack on its sensitive and confidential computer systems," ECF No. 135-5 ¶ 3, but that does not constitute evidence from which a reasonable jury could ascertain what AGS actually *did* during those months. The only other evidence is the email string between two AGS personnel and Unanet on July 27, 2017, in which AGS requested that Unanet check the user logs for July 19. ECF No. 135-7. But there is no evidence in the record of the time it took AGS to send or receive those emails. For these reasons, Infotek has not come forward with any evidence from which a reasonable jury could conclude that AGS's services constitute recoverable losses under the CFAA.

**Pergament & Hallowell**. There are five time entries from Pergament & Hallowell during the pertinent time period that were billed to the "Corporate Breach" matter: "Review email from Ms. Kimmel regarding corporate sabotage; prepare response email; review additional email regarding course of action and prepare responses" (8/3/17); "Review email from Ms. Kimmel regarding corporate matters and prepare response" (8/7/2017); "Review emails from Mr. Lynch and Ms. Kimmel

regarding time card issue and prepare response emails; conference with Mr. Lynch regarding additional background" (10/13/17); "Review email from Ms. Kimmel; review email from Ms. Appleyard and prepare response email requesting additional information" (10/18/17); and "Review emails from Ms. Kimmel and prepare response" (10/19/17). ECF No. 135-6 at 26. Those time entries total $1,237.50. At least based on the current record (*i.e.* subject to potential reconsideration through motions in limine) a reasonable jury could conclude that those fees constitute recoverable damages.

A reasonable jury could not, however, award Infotek the other Pergament & Hallowell fees. Those other fees were billed under the "Dwayne Preston Lawsuit" matter beginning November 10, 2017—after Infotek had obtained the Verizon records and confirmed that Mr. Preston was responsible for the incursion. Those fees constitute attorneys' fees for litigation—not, for example, fees for "attorneys charged with supervising an incident response investigation to determine what wrongdoing occurred," *see ExactLogix*, 508 F. Supp. 3d at 268 n.6.

**Offit Kurman**. That leaves the attorneys' fees incurred by Offit Kurman between August 11 and November 30, 2017. ECF No. 135-6 at 44–48. Offit Kurman filed the initial Circuit Court lawsuit, against "John Doe" to "confirm" the identity of the person responsible for the unauthorized data access, on August 29, 2017. ECF No. 135-10 at 9. The time records reflect work by Offit Kurman attorneys to prepare and file that *John Doe* complaint, to obtain the subpoena to Verizon through that litigation, and then to coordinate with ADF to analyze the subpoena production. Those attorneys' fees are at least potentially recoverable. Although work to prepare the lawsuit and Verizon subpoena were litigation expenses, and attorneys' fees for litigation generally do not qualify as "losses" for CFAA purposes, here there is evidence that filing the lawsuit was

necessary to procure a subpoena to Verizon, which in turn Infotek claims was necessary to “confirm” that Mr. Preston was the person who made the unauthorized Unanet changes. It appears that Mr. Preston would likely have persuasive arguments that at least some of Offit Kurman’s time during those months was for work that, although necessary to Infotek, was not a foreseeable result of Mr. Preston’s unauthorized access. *See, e.g.*, ECF No. 135-6 at 46 (“Reviewed email from client regarding IG investigation”). The Court leaves for another day (*i.e.*, motions in limine) whether there are other July–November 2017 services that fall sufficiently outside the scope of CFAA “loss” to be inadmissible at trial. “[A]s with any reasonableness inquiry, the analysis should focus on whether reasonable prudence was exercised in light of the risks and circumstances presented.” *Animators at Law*, 786 F. Supp. 2d at 1121. Moreover, there are other reasons Infotek may be unable to persuade a jury that those attorneys’ fees are recoverable. For example, Infotek’s original 30(b)(6) designee admitted that it was not until after the NSA received a whistleblower complaint that InfoTek “began to look very *heavily* into not only the security audit logs of Unanet, but also hired outside digital forensics agencies such as . . . Atlantic, among others, to review and [find] out how all of this information had been changed[.]” ECF No. 134-4 at 14 (50:15–51:3) (emphasis added). But for current purposes, Infotek has adequately shown that a reasonable jury could conclude that at least some of Offit Kurman’s time during those months constitute CFAA losses.

* * *

In summary, the motion as to Count 1 will be granted in part and denied in part. Infotek has come forward with evidence from which a reasonable jury could conclude that it incurred at least $5,000 in losses recoverable under the CFAA from among the

fees paid to ADF, Pergament & Hallowell, and Offit Kurman between July and November 2017. *See* 18 U.S.C. § 1030(c)(4)(A)(i)(I) ($5,000 threshold to recover under CFAA's private cause of action); *see also Glob. Pol'y Partners*, 686 F. Supp. 2d at 648–54 (concluding that although there was evidence of "losses" within the meaning of the CFAA, the total amount supported by evidence fell short of $5,000). Otherwise, Mr. Preston's motion for summary judgment as to Count 1 will be granted.

As Judge Blake emphasized earlier in this case, "[v]ictims of CFAA violations may [not] make a mountain out of a molehill when investigating intrusions," and to be entitled to any recovery Infotek must prove that its costs "were 'reasonably necessary' under the circumstances." *Infotek II*, 626 F. Supp. 3d at 894. "After all, Mr. Preston's alterations to Unanet were reversed before InfoTek paid out *any* extra PTO." *Id.* But "[w]hether the looming specter of an NSA probe pushed InfoTek to increase its expenses beyond what was reasonably necessary is a factual question best suited for a jury, not summary judgment." *Id.* That reasoning was part of why Infotek was not entitled to summary judgment. But that reasoning also reflects why Mr. Preston is not entitled to summary judgment, at least as to a portion of the July–November 2017 expenses.

**B. Trespass to Chattels (Count 4)**

"Under Maryland law, trespass to chattels occurs when a person intentionally uses or intermeddles with a chattel in possession of another resulting in the chattel being 'impaired as to its condition, quality, or value.'" *Infotek II*, 626 F. Supp. 3d at 894 (quoting *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 697 (D. Md. 2011)) (footnotes omitted). A chattel owner "is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel." *Van Alstyne v. Elec. Scriptorium, Ltd.*, 560 F.3d 199, 208 (4th Cir. 2009) (quoting Restatement (Second) of

Torts § 218 cmt. e). Whereas a CFAA "loss" includes "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring . . . the system . . . to its condition prior to the offense," 18 U.S.C § 1030(e)(11), a trespass-to-chattels claim requires that the owner of the chattel have been dispossessed of the property, or "deprived of [its] use . . . for a substantial time," or been bodily harmed, or that "the chattel" *itself* was "impaired as to its condition, quality, or value." Restatement (Second) of Torts § 218.

In denying Infotek's earlier motion for summary judgment on the trespass to chattels claim, Judge Blake explained as follows:

> InfoTek's best argument may be that the intrusion "diminished the value of its possessory interest in its computer network." *See Am. Online, Inc.* [*v. IMS*, 24 F. Supp. 2d 548, 550 (E.D. Va. 1998)]. But InfoTek has not established what, if any, "value" was diminished due to Mr. Preston's intrusion. Mr. Preston's breach neither caused InfoTek's "machine[s] to malfunction," *see Microsoft Corp. v. John Does 1-8*, No. 1:14-CV-811, 2015 WL 4937441, at *12 (E.D. Va. Aug. 17, 2015), nor "degraded [Unanet's] performance," nor resulted in the "theft of money." *See id.* Accordingly, the court will deny InfoTek's motion for partial summary judgment as to its claim for trespass to chattels.

*Infotek II*, 626 F. Supp. 3d at 895.

This time, Mr. Preston has moved for summary judgment. It articulates the following theory for how the value of its account with Unanet was impaired:

> Infotek is a government contractor specializing in national security software programming and engineering. For Infotek, data security and integrity are of utmost importance to the core function of its mission. Without the complete, accurate, and truthful understanding of the nature and extent of Defendant's intrusions and alterations, Infotek could not certify the security, integrity, and accuracy of its computer

> systems and data. *See* [ECF No. 135-5]. Therefore, any unexplained anomalies and irregularities within the Unanet system undermined Unanet's value. Infotek lost the value of the Unanet software during the course of Defendant's intrusions, which began before April 2017, through the span of Infotek's investigation, which continued beyond at least December 2021 (the date of Defendant's second deposition).

ECF No. 135-1 at 15.

The problem for Infotek is there is no evidence in the record supporting the theory that any property in Infotek's possession was "impaired as to its condition, quality, or value." Restatement (Second) of Torts § 218(b). It is undisputed that the PTO accruals that Mr. Preston altered were reversed before Infotek paid any additional PTO. It is also undisputed that Infotek never lost access to Unanet or any of its other services. That is different from *Ground Zero Museum Workshop v. Wilson*, where for two days the disgruntled former contractor "took down the [plaintiff's] website and replaced it with [an earlier] version of the site," during which the plaintiff was "arguably dispossessed of the chattel." 813 F. Supp. 2d 678, 697 (D. Md. 2011). The absence of any calculable diminishment in value also renders this case different from *America Online, Inc. v. IMS*, where there was evidence that a bombardment of spam emails "injured AOL's business goodwill and diminished the value of its possessory interest in its computer network." 24 F. Supp. 2d 548, 550 (D. Md. 1998). In short, although Infotek incurred some expenses as a result of Mr. Preston's unauthorized intrusion, and those expenses may be recoverable under the CFAA, there is no evidence that Infotek's property itself (including its account with Unanet) was "impaired as to its condition, quality, or value." Restatement (Second) of Torts § 218(b).

For these reasons, Mr. Preston is entitled to summary judgment on Infotek's trespass-to-chattels claim (Count 4).

**C. Infotek's Fifth Amendment invocations**

For the reasons explained thus far, there are some expenses that Infotek incurred between July and November 2017 that a reasonable jury could conclude constitute "losses" within the meaning of the CFAA. That is a small subset of the total damages that Infotek seeks. But Mr. Preston argues that he is entitled to summary judgment as to that subset too because, by Ms. McComber invoking the Fifth Amendment and refusing to testify as Infotek's 30(b)(6) corporate designee, Mr. Preston became "entitled" to certain "adverse inferences." ECF No. 134-1 at 14.

The Court previously explained that Ms. McComber was permitted to invoke her privilege against self-incrimination at that deposition because (1) her criminal appeal was still pending and thus she "retain[ed] the right to assert" the privilege against self-incrimination, and (2) although she had waived the Fifth Amendment privilege in her criminal case by testifying at her criminal trial that waiver did not extend to this civil case. *InfoTeK*, 760 F. Supp. 3d at 354–58. Following that ruling, Ms. McComber, who remains Infotek's President, CEO, sole shareholder, testified as Infotek's corporate representative for purposes of that deposition. ECF No. 134-3 at 4 (10:19–22) (Infotek's counsel stating that Ms. McComber was appearing for deposition "as the corporate representative" of Infotek with respect to matters within the scope of Defendant's 30(b)(6) notice). In so doing, her testimony constituted the testimony of Infotek itself, which is the plaintiff in this case. Fed. R. Civ. P. 30(b)(6) (providing that when an entity designates a person to testify as a corporate representative pursuant to a 30(b)(6) notice or subpoena, the witness testifies "on . . . behalf" of the designating entity). The 30(b)(6)

notice for that deposition has not been filed, but at that deposition Infotek's counsel did periodically object to matters as falling outside the scope of the 30(b)(6) notice. *See* ECF No. 134-3 at 18, 20, 26 (68:3, 74:10, 100:18). Thus, any questions asked at the June 2025 deposition other than those three as to which Infotek specifically lodged scope objections constitute testimony of Infotek itself.

At the June 2025 deposition, Ms. McComber invoked her Fifth Amendment privilege approximately 200 times, refusing to answer those questions. ECF No. 134-3. The questions as to which Ms. McComber (on behalf of Infotek) invoked her Fifth Amendment rights included various questions that are potentially pertinent to Infotek's CFAA claim, including whether it is entitled to any damages. *See, e.g.*, ECF No. 134-3 at 8 (28:3–8) ("What expenses did plaintiff have in investigating the unauthorized access?"); *id.* (28:9–13) ("What did Plaintiff InfoTek Corporation do to investigate the unauthorized access?"); *id.* (28:14–19) ("When did Plaintiff InfoTek Corporation become aware of the unauthorized access?"); *id.* at 8–9 (28:22–29:2) ("What irreparable harm will plaintiff suffer that forms the basis of this paragraph of the complaint").

"The Supreme Court has long recognized that there exists a 'prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'" *United States v. Mallory*, 988 F.3d 730, 740 (4th Cir. 2021) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). Where a party in a civil action has invoked the Fifth Amendment and refused to testify, "a fact-finder is entitled to draw adverse

inferences from a defendant's invocation of the privilege against self incrimination." *ePlus Technology, Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002).[12]

At trial, Mr. Preston likely will be permitted to put before the jury any of Ms. McComber's refusals to testify on Fifth Amendment grounds, and argue that the jury should infer that the testimony that would have been given would be favorable to him. *See Baxter*, 425 U.S. at 318; *ePlus Tech.*, 313 F.3d at 179.[13] But a fact-finder being "entitled to draw" an adverse inference from a party's Fifth Amendment invocation,

---

[12] In some circumstances, a non-party's Fifth Amendment invocation can also give rise to adverse inferences against a party. In deciding whether to permit such an inference, "[c]ourts generally follow the factors set forth by the Second Circuit in *LiButti* [*v. United States*, 107 F.3d 110, 121 (2d Cir. 1997)]: (1) the nature of the relevant relationships; (2) the degree of control of the party over the non-party witness; (3) the compatibility of interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation." *Mallory*, 988 F.3d at 740 (citing *Libutti*, 107 F.3d at 123–24). Here, when Ms. McComber first testified in 2021 and frequently invoked the Fifth Amendment, she was a "non-party" because she testified as a witness in her personal capacity. If those invocations were the sole basis for Mr. Preston's request for adverse inferences, the Court would need to conduct such a *LiButti* analysis. But here, the invocations that Mr. Preston relied upon were made in 2025 when Ms. McComber was testifying as Infotek's corporate designate under Rule 30(b)(6). Accordingly, the testimony at issue—specifically, the Fifth Amendment invocations—were made *by Infotek*, which is the party against which Mr. Preston seeks to draw adverse inferences.

[13] The "likely" caveat arises from the fact that Ms. McComber's criminal case has fully and finally concluded. If she chooses to reverse course from the 30(b)(6) deposition in 2025 and offer testimony, then Infotek *at trial* may choose to not be "silent." Mr. Preston may still in that circumstance have the benefit of an adverse inference from Infotek's invocation of Ms. McComber's privilege against self-incrimination. *See Privileged Matter—Privilege Against Self–Incrimination*, 8 Fed. Prac. & Proc. Civ. § 2018 (3d ed.) ("[I]f a party is free to defeat discovery with the privilege, while having the full benefit of his or her testimony at trial, the whole process of discovery could be seriously hampered."). But the Court need not and does not decide that issue at this time.

*ePlus Technology*, 313 F.3d at 179, does not mean the jury will be *required* to draw such an adverse inference. "*Baxter* did no more than permit an inference to be drawn in a civil case from a party's refusal to testify." *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977); *see Polacsek v. Debticated Consumer Counseling, Inc.*, 413 F. Supp. 2d 539, 551 (D. Md. 2005) ("[T]he drawing of negative inferences from Fifth Amendment silence is permissive only, not mandatory."); *Mirlis v. Greer*, 952 F.3d 36, 42 (2d Cir. 2020) (approving this jury instruction: "A witness has a right under the Fifth Amendment to the Constitution to decline to answer questions on the ground that doing so may tend to incriminate him. However, you may, *but are not required to*, infer from such refusal that the answer would have been adverse to the witness's interest and the interest of any parties in the case who are closely associated with the witness. You should consider any inference you may or may not choose to draw from a refusal to testify on Fifth Amendment grounds together with all the other evidence in the case.") (emphasis added).

Moreover, the current motion is Mr. Preston's motion for summary judgment. "Even assuming that a *jury* might draw" an adverse inference against Infotek at trial, the courts "are required at summary judgment to draw all reasonable inferences in favor of the non-moving party [here, Infotek]." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005).

Mr. Preston argues that "[a]dverse inferences are permitted to support summary judgment in the face of undisputed evidence." ECF No. 134-1 at 13 (citing *Maryland v. Universal Elections, Inc.*, 862 F. Supp. 2d 457, 464 (D. Md. 2012)). In *Universal Elections*, the defendant had been sued for violating the Telephone Consumer

Protection Act (TCPA) by issuing highly deceptive robocalls, and had also been indicted for the same conduct. In the course of granting summary judgment to the State of Maryland, the court concluded that the state was "entitled to an adverse evidentiary inference from Henson's invocation of his Fifth Amendment privilege against self-incrimination." 862 F. Supp. 2d at 464. But the availability to the State of an adverse inference did not drive that summary judgment decision. Rather, Henson's Fifth Amendment invocations "*corroborate[d]* the reasonable inference that he had knowledge of the relevant TCPA regulations through his extensive campaign experience." *Id.* (emphasis added). The "other evidence" in the record there established that there was "no genuine dispute that Henson knowingly and willfully violated the state." *Id.*

In contrast, here there is evidence in the record beyond the Fifth Amendment invocations that supports Infotek's claim that Mr. Preston's unauthorized intrusion resulted in out-of-pocket expenses for Infotek. *See* § III.A, *supra*. Because the Court must accept that evidence as true and draw all reasonable inferences from that evidence in the non-movant's (Infotek's) favor, the fact that Mr. Preston may be entitled to urge the jury to draw inferences *against* Infotek would not be a proper basis on which to grant summary judgment to Mr. Preston. Or as another court has put it, "even when permitted at the summary judgment stage, an adverse inference, standing alone, is not sufficiently *conclusive* evidence to satisfy a moving party's burden." *Unum Group v. Benefit Partnership, Inc.*, 938 F. Supp. 2d 177, 184 (D. Mass. 2013) (emphasis added); *see also SEC v. Jacoby*, Case No. 17-cv-3230-CCB, 2021 WL 351176, at *8 (Feb. 2, 2021) ("[B]ecause courts are required to draw all reasonable inferences in favor of the nonmoving party on a motion for summary judgment, an adverse inference is

permissible to support the moving party's case only if the moving party has other evidence by which to make its case."); *United States v. Certain Real Prop. and Premises Known as: 4003–4005 5th Ave., Brooklyn, NY,* 55 F.3d 78, 83 (2d Cir. 1995) ("[T]he claim of privilege will not prevent an adverse finding or even summary judgment if the litigant *does not present sufficient evidence to satisfy the usual evidentiary burdens* in the litigation.") (emphasis added); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 n.7 (7th Cir. 1995) (noting that an adverse inference "seems to be in tension with the ordinary summary judgment rule that all reasonable inferences must be drawn in favor of the nonmovant"); *Privileged Matter—Privilege Against Self–Incrimination*, 8 Fed. Prac. & Proc. Civ. § 2018 (3d ed.) ("In some cases if a party claims the privilege and does not give his or her own evidence there will be nothing to support his or her view of the case and an adverse finding or even a directed verdict or grant of summary judgment will be proper. But it does not necessarily follow that a party will be unable to prove his or her case or rebut the opponent's case without his or her own testimony.").

For these reasons, although Infotek's invocations (through Ms. McComber) of the Fifth Amendment to refuse to testify likely will entitle Mr. Preston to invite the jury to draw inferences adverse to Infotek from those refusals to testify, that does not permit the Court to ignore the other evidence in the record. That evidence, as explained above, would permit a reasonable jury to award damages to Infotek—albeit only a portion of the expenses that Infotek incurred during the limited period from July 2017 through, at the latest, November 2017.

## IV. CONCLUSION

For these reasons, Mr. Preston is entitled to judgment as a matter of law on Count 4, Infotek's trespass-to-chattels claim. And Infotek has voluntarily moved to

dismiss Counts 2, 3, 5, 6, and 7, so those Counts will be dismissed with prejudice. As to Count 1 under the CFAA, Mr. Preston is entitled to judgment as a matter of law as to any expenses that Infotek incurred before July 17, 2017 or after December 1, 2017, but his motion as to expenses between those dates will be denied. A separate order follows.

Date: September 23, 2026

/s/
Adam B. Abelson
United States District Judge